(44 App. Div. 435.)

BANK OF CHINA, JAPAN & THE STRAITS, Limited, v. MORSE.

(Supreme Court, Appellate Division, First Department. November 24, 1899.)

1. EFFECT OF JUDGMENTS OF FOREIGN COURTS.

In an action by an English corporation against a stockholder, a resident of New York, to recover money alleged to be due by way of calls on the stock, pursuant to a scheme of corporate reorganization, an order of an English court approving such scheme, and declaring it to be binding on all persons interested, does not impose on defendant, who was no party to the proceedings, any personal liability other than that resulting from his contract.

2. CORPORATIONS—ACTION AGAINST STOCKHOLDERS—DEFENSES.

It is a defense to an action against a stockholder, to recover for the call made on his shares, that the call was made for a purpose not warranted in the constitution of the company.

3. SAME—DISSOLUTION.

An arrangement begun under section 161 of the English companies act of 1862, providing for the voluntary winding up of a corporation, does not cease to be within the section merely because presented to the court for supervision and approval.

4. STATUTES—CONSTRUCTION—QUESTION FOR COURT.

The construction of a foreign statute, in connection with expert testimony as to its meaning, presents a question of law for the court.

5. ENGLISH COMPANIES ACT—WINDING UP OF COMPANY—CALLS.

The words "business and property," as used in section 161 of the English companies act, authorizing the sale, by a corporation being wound up, of its business and property, do not include unpaid subscriptions for which a call has not been made.

6. SAME—VALIDITY OF REORGANIZATION SCHEME.

Section 161 of the English companies act gives the liquidator of a corporation being wound up the power to receive, in consideration for his transfer of the business to another company, shares, policies, or other like interests of the new company, "for the purpose of distribution" among the members of the company being wound up. A reorganization scheme, under said section, provided for calls on unpaid subscriptions by the liquidator, the proceeds to be paid to the new company, which agreed only to devote the assets of the old company and so much as necessary of the calls to the debts of the old company. Held, that the scheme goes beyond the statute, in that the shareholders receive nothing, though the assets of the old company are sufficient to pay its debts, or the call is more than sufficient therefor.

7. SAME—EXCESSIVE CALLS.

A liquidator of a corporation being wound up under section 161 of the English companies act, with statutory authority to make such calls on unpaid subscriptions as he deems necessary to satisfy the debts of the company, has no authority to make a call for a sum many times larger than necessary to accomplish that object, at a time when it must have been known that so great a call was unnecessary, and that the money realized would be used for other purposes.

8. SAME—INEQUALITY OF CALLS.

On the winding up of a company, under section 161 of the English companies acts, it was stipulated in the scheme for the transfer of the property to a new company that those stockholders who should take an additional allotment of shares in the new company should be relieved from the payment of a portion on the call against them for unpaid subscriptions, and that those who should not take new shares should be liable for the full amount of the call, and receive nothing in return. Held, that the scheme is violative of the general rule contemplated by the statute, that the calls to be made should be equal.

Appeal from trial term, New York county.

Action by the Bank of China, Japan & The Straits, Limited, against William Horace Morse. From a judgment entered on a verdict for plaintiff directed by the court, and from an order denying a new trial, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and O'BRIEN, JJ.

John W. Houston, for appellant.

Stephen H. Olin, for respondent.

RUMSEY, J. The action was brought to recover a sum of money alleged to be due from the defendant to the plaintiff by way of calls upon 685 shares of the capital stock of the plaintiff for which the defendant had subscribed. The plaintiff is an English corporation, organized under the companies act of 1862 and its amendments. These acts were alleged in the complaint, and were proved, and no question has been made either as to their existence or their terms. As originally organized, the capital of the plaintiff company was £1,000,000 sterling, divided into 1,250 founders' shares, of £1 each, and 99,875 ordinary shares, of £10 each. Its original name was the "Trust & Loan Company of China, Japan & The Straits, Limited," but that name was subsequently changed to the present one, and the capital stock increased to £2,000,000. The corporation was at first exceedingly prosperous, but in the latter part of 1894 it became necessary to wind up its business. Before that time the corporation had made large investments in the East, where its business was great, and had a considerable amount of money due to it from people living there. Its indebtedness was also very large, and was payable in gold or its equivalent. If, however, it could have realized its investments, and collected the debts due it in money of the same value, it would have been able to pay all its liabilities. But these debts were due in countries where business was transacted in silver, and, owing to the great depreciation in the value of that metal, it was quite evident that, if the debts were paid in it instead of in gold, the value of the assets of the corporation would be so small that it would be insolvent. In this situation, extraordinary general meetings of the company were called, in pursuance of the companies act, at which it was resolved that it was desirable to reconstruct the old company (meaning the plaintiff), and that to that end the company be wound up, and Mr. Charles H. Campbell was appointed liquidator to do it. It was further agreed that the liquidator be authorized to consent to the organization of a new company, and that the draft agreement presented to the meeting, and expressed to be made between the plaintiff and its liquidator on the one part, and the new company on the other, be approved, and that the liquidator "be, and he is hereby, authorized, pursuant to section 161 of the companies act of 1862," to enter into an agreement with such new company when incorporated, and carry the same into effect, "with such modifications as he may think fit to make."

This resolution was passed in the manner prescribed by the statute, and pursuant to it such steps were taken as the statute required

for the winding up of the old company, and for the organization of a new one, and, when that company had been organized, the reconstruction scheme spoken of in the resolution was entered into. This was finally completed on the 21st day of February, 1895, and the agreement was that day signed by the parties to it. Afterwards, in pursuance of the provisions of the statute, such proceedings were had, in the proper court, that the "scheme" or "arrangement," as it was called, embodied in the agreement of the 21st of February, was judicially approved, and declared to be binding on all persons interested. Thereupon a call was made by the liquidator upon the stockholders for the unpaid subscriptions to their stock. Before the winding up had been begun, a call for the payment of 20s., at specified times, had been made upon the stockholders, and some of them had paid this call. The call made by the liquidator required the payment of £8. 15s. from all stockholders who had not paid the former call of 20s., and of £7. 15s. from the stockholders who had paid that call. The call upon the defendant was for £8. 15s. for each one of the 685 shares of which he was owner, and the plaintiff recovered the full amount of that call. The defendant is a citizen of this state, and was not in England at any of the times when these proceedings were carried on, and had no notice, actual or otherwise, of them or any of them.

The plaintiff claims to recover in this case upon the grounds that it is an English corporation; that the corporation having been organized in England under English law, and the contract of subscription for shares having been made there, it is an English contract, to be interpreted by the English law; and that the defendant, when he entered into it, agreed to whatever liability the English law imposed upon him as a member of the corporation. That this is the law is not denied. Railway Co. v. Gebhard, 109 U. S. 528, 537, 3 Sup. Ct. 363, 27 L. Ed. 1020; Bank v. Boardman, 47 Hun, 135, 142. Plaintiff further claims that this scheme or arrangement, which the calls upon the defendant were made to carry into effect, was one which the plaintiff company and the liquidator were authorized to enter into under section 161 of the companies act, and for that reason it was binding upon the defendant. It claims, further, that, as the scheme was approved by the order of the high court of justice, a court having jurisdiction, it became binding upon all subscribers to stock, even if without such approval it would not have been binding. That being so, it insists that the liability of the defendant has been substantially adjudged in the English court, and therefore he is not at liberty here to deny it.

As to the claim that the scheme of reorganization acquired its validity as against this defendant, who is not an English citizen or subject to the English law, by the order of the English court, which, as to him, was ex parte and without jurisdiction of his person, so as to impose upon him a personal liability which, but for his contract, he was not subject to, that has been disposed of by the general term of this department in the case of Anderson v. Haddon, 33 Hun, 435, where it was held, in an action in a court of this state against a stockholder of a Scotch bank who was a resident of this state,

upon a liability created by a decree of the court of sessions in Scotland, that that decree was of no force or validity. That case is in point, and is in accordance with the well-established rules which control the effect of judgments of foreign courts. Black, Judgm. § 836. Unless, therefore, the defendant's liability solely arises out of the contract which he entered into, the plaintiff cannot recover in this action.

Before proceeding to our examination of that question, it is proper to take notice of the claim of the plaintiff that the call is conclusive upon the defendant, and that he cannot be heard in this action to say that it was not properly made. That proposition is not tenable. The law is well settled, not only in this country, but in England, that, in an action against a stockholder to recover for the call made upon his shares, it is a defense that the call was made for a purpose not warranted in the constitution of the company. Mor. Priv. Corp. § 150; Thring, Joint-Stock Cos. (5th Ed.) p. 50; East Anglian Ry. Co. v. Eastern Counties Ry. Co., 11 C. B. 775–811; Railroad Co. v. Croswell, 5 Hill, 383. If the arrangement in pursuance of which the call is made is illegal, the stockholder may, in England, bring an action to procure a judgment that it is not binding and to set it aside; and he may bring this action either in his own behalf, or in behalf of himself and all others in the same position. Clinch v. Corporation, L. R. 5 Eq. 480, 4 Ch. App. 117. In this country there has never been any question of the right of a shareholder to resist an unauthorized call, either by a suit to set it aside, or by answer in an action to collect the amount of it. Mor. Priv. Corp. §§ 145, 150, 279. In this state, where the same court has jurisdiction in law or in equity, the defendant is allowed to set up any defense, whether legal or equitable, which he may have. Code Civ. Proc. § 507. There is no reason, therefore, why this defendant in this action should not be permitted to defend because the call is not valid.

That defense is based upon the proposition that the scheme which lies at the foundation of the act of the liquidator, and which the call was made to carry into effect, was not lawful, under section 161 of the companies act. It is suggested by the plaintiff that, although the scheme was arranged and undertaken in pursuance of section 161 of the act, yet, having been presented to the court for supervision and approval, it ceased to be a scheme under section 161, and became effective under sections 95 and 133 of the act. To this contention there are two answers.

Section 161 of the act relates, not only to a purely voluntary winding up, but includes a voluntary winding up under the supervision of the court, and an arrangement begun under section 161 does not cease to be within the section because the winding up has been brought within the supervision of the court. In re Imperial Mercantile Credit Ass'n, L. R. 12 Eq. 504. Even if the scheme were not within section 161, and derived its vitality solely from the order of the court, yet, as the court had no jurisdiction of the defendant, its order does not impose any obligation upon him. It is very clear that not only was this scheme undertaken in pursuance of

section 161 of the companies act, but that it was carried through in pursuance of the same section. All the notices to stockholders before the supervision order advised them that the reconstruction would be had "pursuant to section 161." That order was made on the 27th day of March, 1895, and the scheme was sanctioned by an order made on the 30th of April. After the entry of the order, a statement was sent to the shareholders of the old company, advising them of the action of the court, and inclosing a copy of the order to each one, and stating again that the reconstruction was made pursuant to section 161 of the companies act. It is too late for the plaintiff at this time to seek to change its position in that regard, and our further consideration of the case will be upon the suppo-, sition, which is undoubtedly the truth, that a call made to carry into effect an arrangement under section 161 must be sustainable under that section, if it is to be 'enforced in our courts.

There was no dispute on the trial as to the existence of the companies act or as to its phraseology. The statute was put in evidence. But expert testimony was given on the part of the plaintiff to show that, under the settled construction of this section, the scheme in question was valid. The gentlemen who in this testimony gave their opinions as to the proper construction of the act based their conclusion upon various decisions of the courts in England, which were read upon the trial and which we have examined. The question as to the construction of this section is therefore presented to us substantially upon the statute and judicial opinions. In such cases, it is well settled that the construction and effect of the statute is not a question of fact for the jury, but a question of law for the court, and it is to be decided precisely as any question of law. Bank v. Boardman, 47 Hun, 135; Kline v. Baker, 99 Mass. 253; Bank v. Barry, 20 Md. 287; Di Sora v. Phillips, 10 H. L. Cas. 634–638; Bremer v. Freeman, 10 Moore, P. C. 306; U. S. v. McRae, 3 Ch. App. 79.

Section 161 of the statute in question reads as follows:

"Where any company is proposed to be or is in the course of being wound up altogether voluntarily, and the whole or a portion of its business or property is proposed to be transferred or sold to another company, the liquidators of the first mentioned company may, with the sanction of a special resolution of the company by whom they were appointed, conferring either a general authority on the liquidators, or an authority in respect of any particular arrangement, receive in compensation or in part compensation for such transfer or sale, shares, policies, or other like interests in such other company, for the purpose of distribution amongst the members of the company being wound up, or may enter into any other arrangement whereby the members of the company being wound up may, in lieu of receiving cash, shares, policies or other like interests, or in addition thereto, participate in the profits of or receive any other benefit from the purchasing company; and any sale made or arrangement entered into by the liquidators in pursuance of this section shall be binding on the members of the company being wound up; subject to this proviso, that if any member of the company being wound up who has not voted in favor of the special resolution passed by the company of which he is a member at either of the meetings held for passing the same expresses his dissent from any such special resolution in writing addressed to the liquidators or one of them, and left at the registered office of the company not later than seven days after the date of the meeting at which such special resolution was passed, such dissentient member may require the liquidators to do one of the

following things as the liquidators may prefer; that is to say, either to abstain from carrying such resolution into effect, or to purchase the interest held by such dissentient member at a price to be determined in the manner hereinafter mentioned, such purchase money to be paid before the company is dissolved, and to be raised by the liquidators in such manner as may be determined by special resolution; no special resolution shall be deemed invalid for the purposes of this section by reason that it is passed antecedently to or concurrently with any resolution for winding up the company or for appointing liquidators; but if an order be made within a year for winding up the company by or subject to the supervision of the court such resolution shall not be of any validity unless it is sanctioned by the court."

The agreement pursuant to which these calls were made is set out at length in the case. It purports, as has been stated, to be made pursuant to section 161 of the companies act. It recites the appointment of the liquidator for the old company, and the reorganization of the new one, and agrees that the old company, by the liquidator, shall sell and transfer to the new company "all lands, buildings, goods, chattels, moneys, credits, debts, bills, notes, and things in action of the old company, and the undertaking, business, and good will thereof, with the full benefit of all contracts and agreements, and of all securities, in respect of the said things in action, to which the old company is entitled, and all other the real and personal property and assets of the old company whatsoever and wheresoever, subject, nevertheless, as to all the said premises, to the several mortgages, charges, liens, and incumbrances affecting the same or any part thereof. The assets aforesaid shall be considered to include all the capital not yet paid up on the issued shares in the capital of the old company, whether called or to be called as herein provided." It further provided that the liquidator should enforce payment of the previous call, which has been mentioned, and also of the remaining £7. 15s. per share due upon each share of the old company stock. It provided that each holder of the ordinary shares in the old company should be entitled, during a certain time, to have allotted to him one ordinary share of £8 in the new company, with 5 shillings credited as paid up on it, and that the sum of £3. 15s., in respect of each share of the new company, should be paid to it at a time specified in the agreement. It provided, further, that each holder of ordinary shares in the old company, who took up the whole of the ordinary shares in the new company to which he was entitled, should be relieved from the payment of the £7. 15s. per share capital which he might be called upon to pay otherwise. It further provided that any holder of shares in the old company who should not, within three months from the time that the agreement became absolute, claim his allotment of shares in the new company, should lose all right to such allotment; but should remain liable to pay up in full all moneys payable in respect of his shares in the old company, with interest. It provided, further, that all the moneys collected upon the calls on the shares of the old company should be paid over to the new company. In consideration of all this, the new company agreed to provide for the payment, in a manner prescribed in the agreement, of the debts of the old company.

It will be seen, therefore, that the result of this agreement was that each shareholder of the old company was to be called upon to

61 N.Y.S.—18

pay the full amount unpaid upon his subscription, and that all of the money thus paid, in addition to all the assets of the old company, was to be turned over to the new company, which undertook the payment of the debts of the old company and assumed no further liability. Those stockholders of the old company who should see fit to become members of the new company were to receive a share of its stock in exchange for each share which they might hold of the stock of the old company, and to agree to pay upon each of the shares turned over to them a call of £3. 15s., with a possible liability to pay a further amount of £4 if it should become necessary. But, if they did not see fit to take the allotment of shares in the new company, each one refusing was to be liable to pay the full amount of his subscription in the old company's stock, and receive nothing whatever. This scheme of "reconstruction," as it is called, is really an out and out sale by the old company to the new one to be organized. Simpson v. Theater Co., 69 Law T. (N. S.) 70.

The question presented is whether there is anything in section 161 of the companies act which authorized a call to be made for the purpose of such sale. The first complaint made by the defendant in respect of this scheme is that it provides for the sale by the old company to the new company, not only of all the property of the old company in existence, but of unpaid subscriptions which have not yet been called, and requires the liquidator to make a call for the amount of these subscriptions, for the purpose of turning the proceeds over to the new company. He insists that the statute authorizes simply the sale by the winding-up company of its business or property, and of nothing else, and that under that authority it is not permissible for the winding-up company to agree to turn over to the new company the proceeds of calls which have not yet been made. To sustain that proposition, he cites case of Clinch v. Corporation, L. R. 5 Eq. Cas. 480. The question in that case was whether a scheme of "amalgamation," so called, was valid, under section 161 of this act in question. The objection was that by the scheme the defendant had disposed of unpaid subscriptions not yet called, and required the liquidator to call up from the stockholders of the winding-up company a certain amount upon the subscriptions upon their shares which had been turned over to the purchasing company as a portion of the business and property transferred. It was held by the court, in the first place, that the only question there presented was whether this arrangement could be supported under section 161 of the companies act. The court held, further, that there was nothing in that section which authorized the winding-up company to buy the shares of another company with anything but assets; that the assets to be used for that purpose were only assets on hand at the time of the liquidation, and not assets to be got by calls. Upon appeal, that decision was affirmed (4 Ch. App. 117), and the law, as laid down by the vice chancellor, was sustained by Lord Cairns, who at that time was lord chancellor, and, if this case be still the law of England, there can be no question that the defendant's objection to this scheme is well taken.

But it is said that the case has been overruled on this particular point by subsequent decisions of the English courts. The first case referred to as having that effect is Extraction Co. v. Peacock [1894] 1 Q. B. 623. That was an action brought to recover the amount of the unpaid calls made upon Peacock in respect of 381 shares held by him of the plaintiff's capital stock. The call was made pursuant to an agreement between the plaintiff corporation and another one, by which the plaintiff corporation amalgamated with the other, and, as one of the conditions of that amalgamation, agreed to make a call upon each of its shareholders for the remainder of their unpaid subscriptions, and to transfer the proceeds of that call, with all other of its property, to the purchasing company. In an action . upon the call, it was objected that the agreement was beyond the power of the plaintiff to make. The only question presented to the court was whether the directors of the company, under its articles of association, had the power to amalgamate with another company, and, if they had, whether they could transfer, as a portion of the consideration for the amalgamation, the proceeds to be obtained from unpaid calls. The defendants, to show that the scheme was not valid, cited the case of Clinch v. Corporation, but the court held that it was not an authority bearing upon the question. It was said that the question in the Clinch Case was as to the validity of an amalgamation, which, if it could be supported at all, must be supported under section 161 of the companies act. It was said, further, that in the Clinch Case it was admitted that there was no power, under the constitution of the financial corporation, to warrant the agreement which was entered into; but in the Peacock Case the court held that there was in the New Zealand Company's articles of incorporation a provision authorizing such an arrangement, and for that reason the Case of Clinch had nothing to do with the question presented in Peacock's Case.

It is also claimed that the Clinch Case has been overruled, on the question at issue here, by the case entitled In re Bank of South Australia [1895] 1 Ch. 578. It is not necessary to state the facts of that case, but only to say that, both at the original hearing and in the court of appeal, it was expressly held that the case of Clinch v. Corporation had no application whatever, and that the action taken in the Case of the Bank of South Australia was not taken under section 161 of the companies act.

The Clinch Case was re-examined in Imperial Bank v. Bank of Hindustan, L. R. 6 Eq. Cas. 91, and the doctrine asserted in it was reaffirmed. But it is said that the words "business and property," used in section 161, include subscriptions for which a call has not yet been made, and therefore the plaintiff had authority to transfer these subscriptions, with the other property, as assets of the company. There can be no doubt that a corporation may, under certain circumstances, deal with unpaid subscriptions, which have not yet been called, as assets and property of the corporation; but it seems to us that it has been determined, and is the settled law of England, that the words "business or property," without more, do not include unpaid capital which has not yet been called. The leading

case on the subject is Stanley's Case, 4 De Gex, J. & S. 407. In that case the deed of settlement of a joint-stock company authorized the directors to borrow money on the security of the property and funds of the company. Under that authority, the directors issued a debenture, assigning to a lender "all and singular the capital stock, moneys, securities for money, estate, and effects of the society, whatsoever and wheresoever, and whether in hand or afloat." Upon the winding up of the company, the creditor claimed that he was entitled to be preferred, under this indenture, not only as to all assets and property existing at the time of the winding up, but as to all unpaid capital of the company. His claim was overruled, the court holding that the subscribed capital not yet paid did not constitute funds and property of the company. This case has been followed as a leading case more than once. In re Colonial Trusts Corp., 15 Ch. Div. 465; In re Streatham & General Estates Co. [1897] 1 Ch. 15; Newton v. Land Co. [1895] App. Cas. 244.

It is claimed that Stanley's Case is limited by Pickering v. Railroad Co., L. R. 3 C. P. 235. The question in that case was whether an assignment to the plaintiffs of a call upon the shareholders by way of mortgage was good. The agreement expressly assigned the call, which had been made, but was not yet due. The court held that there was a debt due from the company to the plaintiffs, to whom the mortgage had been made; that the call, having been made, was a debt from the shareholders to the company, although not yet payable; and there was no reason why an assignment of a debt due to the company should not be made to a creditor to secure him for a debt due from the company. Stanley's Case does not seem to have been referred to by any of the judges. It certainly was not at all in point.

In re Sankey Brook Coal Co., L. R. 9 Eq. 721, is also cited as limiting the doctrine of Stanley's Case; but the court say that the case was not one of those where the company had assigned its future calls, or all calls, or had assigned its, estate and effects, and the question was not whether such an assignment comprised future calls, but was one where the call had been determined upon before the assignment, and it was like the case of a mortgage of a call already made, and not yet paid. Stanley's Case, therefore, had no application. The doctrine of Stanley's Case was considered in Re Pyle Works, 44 Ch. Div. 534, but the rule established was not questioned or impugned.

It appears from the scheme, also, that every penny of the money received as the proceeds of these calls is to be paid to the new company, and is to become its property, and that, as a consideration, it agrees only to devote the assets which it received from the old company, and whatever may be necessary of the proceeds of the calls, to the payment of the debts of the old company, and that the shareholders receive nothing whatever in return. It seems, too, that in these provisions the liquidator went beyond the power vested in him by section 161. He had authority to receive, in compensation for his transfer, shares, policies, or other like interests of the new company, for the purpose of distribution among the

members of the company being wound up.  It is not intended to say that, if the assets of the company being wound up are not sufficient to pay its debts, the liquidator is bound to distribute anything that he received from the purchasing company, without regard to the amount to the debts.   He is undoubtedly bound, in the first instance, to pay the debts of his company, but, if any surplus remains after that is done, it is quite clear that it is his duty to distribute such surplus among the shareholders of his own company.    This is the rule established by section 133 of the companies act, which regulates and controls the distribution of whatever is received by the liquidator in pursuance of any scheme adopted under section 161.   Griffith v. Paget, 5 Ch. Div. 894; Simpson v. Theater Co., 69 Law T. (N. S.) 70.   By the scheme in question, it was inevitable that the shareholders should receive nothing, even if the assets of the old company had been more than sufficient to pay its debts.   As a matter of fact, it appears that, in addition to the assets of the old company, and taking no account of its good will, only £180,000 were required to pay its debts.   To raise that sum, it was necessary to pay only about £1. 15s. on the shares of the persons who accepted allotments in the new company; so that, after paying the debts, the new company would have the proceeds of £2 sterling upon each one of its shares to use as working capital.   The unpaid capital of the old company on the 12th of December was £1,643,641 sterling.   A call of £7. 15s. on this capital created a fund thousands of pounds greater than was necessary to pay the debts. This fact was apparent as early as May, 1895, and yet the call for this excessive sum was made upon the 31st of that month.   It is quite true that the liquidator had authority, under the statute, to make such calls as he might deem necessary to satisfy the debts and liabilities of the company.   But that did not authorize a call for a sum many times larger than was necessary to accomplish that object, at a time when it must have been known that so great a call was not necessary, and that the money paid upon it would necessarily be used for other purposes.

It is evident, too, that the statute contemplated that the calls to be made upon the contributors should be equal, and that one should not be charged with a greater proportion to pay the debts of the corporation than another, as is the general rule in respect to such matters.   Mor. Priv. Corp. § 154.   It requires no argument to show that, in any event, this call operated most unequally upon the different shareholders.   Those who saw fit to take an additional allotment of shares in the new company were relieved from the payment of the £4 upon their call, and those who did not see fit to do so had none of the privileges which were given to them by section 161, but were compelled to pay twice as much as the other shareholders, and receive nothing in return.   The other objections to the call it is not necessary to consider.

Our conclusion is that the call upon which the demand against the defendant was based was invalid; that it was beyond the power of the company and liquidator to make; and that the call based upon it was not binding upon the defendant, who had not been

made subject to the orders of the court by which it was sought to be confirmed.

The judgment and order therefore must be reversed, and a new trial ordered, with costs to the appellant to abide the result of the action. All concur.