(57 App. Div. 590.)

## WHITEHEAD et al. v. HEIDENHEIMER et al.

(Supreme Court, Appellate Division, First Department.   February 8, 1901.)

1. DRAFTS—VALIDITY—LEX LOCI CONTRACTUS.

Where it was understood by the parties to drafts made in Germany, but payable in New York, that they should be negotiated in Germany, and they were drawn for that purpose, and the money actually advanced on them there, the law of Germany, and not that of New York, governed their validity.

2. SAME—ACCOMMODATION PAPER—EVIDENCE.

Where money was advanced to a firm on drafts drawn by them on another firm in favor of the lender, and the drawees accepted the drafts, but no part of the money nor any benefit from the drafts accrued to them, there was evidence sufficient to sustain the trial court's finding that the drafts were accommodation paper.

3. SAME—FOREIGN LAWS—USURY—VARIANCE—PLEADING AND PROOF.

It was alleged in a defense of usury that the German law provided that whoever should ask or receive interest exceeding the customary rate to such an extent that the interest on the capital was in remarkable disproportion to the services rendered should be imprisoned, etc.   The law of Germany, as proved, provided that a person who takes advantage of the necessities, recklessness, or inexperience of another, and accepts profits for a loan so much in excess of the customary rate of interest that the recompense is strikingly disproportionate to the services rendered, shall be guilty of usury.   There was no proof of advantage taken of the borrower's necessities, recklessness, or inexperience.   *Held*, that there was a fatal variance between the pleadings and the proof, and the defense of usury failed.

4. SAME—TRIAL.

Where there was evidence tending to establish a defense of usury under a German statute, such question was one of law, since it involved the construction of the statute, and it was not error for the court to determine it.

5. SAME—PLEADING—RELEASE OF SECURITIES.

It was alleged in the answer in a suit on drafts that when they were drawn the payee held as security for the payment of the indebtedness represented by them a large number of valuable stocks and liens; that defendants, relying on such securities, accepted the drafts for the accommodation of the drawers; that while the payee owned the drafts he agreed with the drawer to release him from all liability thereon in consideration of retaining at a certain valuation certain of the securities, and for certain moneys received by him to release the other securities held to secure such drafts; that such agreement was fully performed; and that by reason of such agreement and its performance the defendants were greatly damaged.   *Held*, that such release of securities was sufficiently pleaded.

6. SAME.

Where the evidence showed that the payee of certain drafts took title to some of the securities therefor and released others through an agreement with the drawer, it was error not to allow the accommodation acceptors to show the value of the securities retained, since they had a right to be credited with the amount thereof.

Action brought by Louis Heidenheimer, continued after his death by Aaron P. Whitehead and Welcome S. Jarvis, ancillary executors, against Charles and Louis Heidenheimer.   On motion for a new trial.   Granted.

Argued before VAN BRUNT, P. J., and HATCH, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

George A. Strong, for plaintiffs.
Samuel Untermeyer, for defendants.

RUMSEY, J. The action was brought by Louis Heidenheimer in his lifetime against Charles and Louis Heidenheimer to recover upon 18 drafts drawn by Wilhelm Heidenheimer upon the firm of C. & L. Heidenheimer, and accepted by them, of which drafts the plaintiff claimed to be the holder for value. One defense was that all the drafts were void for usury. As to 13 of the drafts, it was claimed that they were drawn by Wilhelm Heidenheimer upon the firm of C. & L. Heidenheimer, and accepted by the drawees for the accommodation of the drawers, and that this fact was known to Louis Heidenheimer. It was alleged that as to those drafts Louis Heidenheimer had in his hands securities put there by the drawers of the drafts to secure their payment, that he released those securities at the request of the drawers, and for that reason the accommodation acceptors were discharged. After the case was at issue, Louis Heidenheimer died, and the action was continued in the name of the present plaintiffs, who were appointed ancillary executors under his will. The court, at the close of the evidence, ordered a verdict for the plaintiffs for the full amount of the drafts, and directed the exceptions to be heard in the first instance in this court. The drawers of the drafts were doing business in Nuremberg, Germany, under the firm name of Wilhelm Heidenheimer. The original plaintiff lived at Frankfort, Germany. The defendants lived in the city of New York, and did business there under the firm name of C. & L. Heidenheimer. There was no dispute that each one of the drafts was drawn in Nuremberg to the order of Louis Heidenheimer, and was addressed to the firm of C. & L. Heidenheimer in the city of New York. They were sent by the drawers to Louis Heidenheimer, who remitted to them a certain sum of money on each draft, and he then sent the drafts to C. & L. Heidenheimer, by whom they were accepted, and returned to him. It is not disputed that the amount deducted by Louis Heidenheimer upon each draft was more than the legal rate of interest either in Germany or in New York, and it was insisted that because of that usurious discount the drafts were void, both by the law of Germany and by the law of New York. Whether they were void for usury is the first question presented upon this motion.

There can be no doubt that when these drafts were drawn it was intended that they should be sent directly to the payee named in them; that whatever money was advanced on the faith of them should be advanced in Germany; that the payee was to forward them to the drawees, and they, after acceptance, were to return them to him. It appeared, however, that the drafts were accepted at the place of business of the acceptors in New York, and payable there; and because of that fact it is claimed by the defendants that the drafts are New York drafts, and that, as they were negotiated at a rate of interest which would be usurious under the laws of New York, they are void in this jurisdiction, and therefore the plaintiffs are not entitled to recover upon them. We do not deem it neces-

sary to enter upon a prolonged discussion of the question of the place whose law applies as to the validity of a contract. It is difficult, if not impossible, to reconcile all the cases on that question to be found in the books. In view, however, of the undisputed facts that it was understood by the parties that these drafts should be negotiated in Germany; that they were drawn for that purpose, that the money was actually advanced upon them there, we ·think that as to their validity the law of Germany controls, and not the law of New York, although by their terms they were made payable in this state. The case is precisely within the rule laid down in the case of Tilden v. Blair, 21 Wall. 241, 22 L. Ed. 632. That case seems to have been accepted as settling what law governs negotiable paper made and intended to be used as this paper was. The cases on this subject will be found in 8 Notes U. S. Rep., at page 416, where the annotator has collected the various cases in which Tilden v. Blair has been considered. It is quite true that the cases of Jewell v. Wright, 30 N. Y. 259, and Dickinson v. Edwards, 77 N. Y. 573, seem to be adverse to the proposition laid down in Tilden v. Blair; but the later cases of Bank v. Low, 81 N. Y. 566, and Sheldon v. Haxtun, 91 N. Y. 124, have followed it. We do not think it necessary to attempt to reconcile the cases, but simply to say that, in our judgment, Tilden v. Blair, and those cases which follow it, must be applied to the case at bar. The contracts, then, were German contracts. But the defendants claim that, even if the contracts are to be governed by the law of Germany, yet they are usurious under that law. The plaintiffs insist, however, that the transaction was not a loan of money to Wilhelm Heidenheimer by the payee of the drafts, but was a purchase by him of drafts drawn against funds of Wilhelm Heidenheimer in the hands of the drawees, and that, therefore, it·was a mere purchase of negotiable paper already having an inception, and, whatever might be the price paid for them, there could be no usury. To that the defendants reply that, as to five of these drafts, the transaction was undoubtedly a loan of money to C. & L. Heidenheimer upon the faith of them; that the excessive interest was deducted in Germany at the time of the loan; and that, therefore, as to those drafts, if the law of Germany applies, they were undoubtedly usurious. As to the other 13 drafts, there is no dispute that the money was paid directly to Wilhelm Heidenheimer by the plaintiffs, and that the drafts were sent by him to the firm of C. & L. Heidenheimer for acceptance. It was held by the learned justice in the court below that those drafts were accommodation paper, and the case was decided by him upon that theory. Although that is disputed by the plaintiffs, yet we are satisfied that the evidence was sufficient either to warrant that conclusion as a necessary inference, or, at least, to require the question of fact to be submitted to the jury. Upon that point it is necessary only to call attention to the evidence of Edmond Heidenheimer, one of the firm of Wilhelm Heidenheimer, who was sworn as a. witness on behalf of the plaintiffs. He testifies that the transaction between his firm and Louis Heidenheimer, who was his uncle, began by his uncle giving credit to a firm in New York of 100,000 marks. That credit

terminated in 1888. The firm of Wilhelm Heidenheimer then applied for that credit of 100,000 marks, and after some negotiation the credit was transferred to that firm. He says that the loans of this 100,000 marks made to the firm of Wilhelm Heidenheimer were represented by drafts drawn by Wilhelm Heidenheimer on the New York firm, and that money went to the firm of Wilhelm Heidenheimer; and he says further that the firm of Wilhelm Heidenheimer had and retained the benefit of all those 13 drafts, and that C. & L. Heidenheimer had no part of it. That testimony is positive and direct on that subject. It was given by a person who was sworn on the part of the plaintiffs, and who, so far as appears, had no interest in the transaction; and certainly his testimony tending to make him a principal debtor was contrary to his interest. But the testimony of the plaintiffs, taken by commission, not only corroborates the testimony of Edmond Heidenheimer, but is of itself sufficient to justify the conclusion that the 13 drafts were not only drawn for the benefit of Wilhelm Heidenheimer, who made the loan in Germany, but that it was so understood by the plaintiffs' intestate. Therefore either the learned justice below was correct in holding as a matter of law that the drafts were accepted by the defendants for the accommodation of the drawers, or there was certainly sufficient evidence to go to the jury to prove it; and in either case this motion must be decided as though that were the fact in the case. Assuming that to be the fact as to the 13 drafts, and that the money was advanced upon those drafts to the drawers as a loan, and that, as is undisputed, the amount retained from each advance was considerably more than the legal rate of interest in the empire of Germany, the evidence would at least warrant a finding that the drafts were usurious, if the defendants had properly and sufficiently pleaded the usury under the law of Germany so as to make it available to them here.

In pleading the defense of usury it is necessary to set out all the facts which constitute the usury complained of, and, unless that is done, the defendants cannot take advantage of that defense. Manning v. Tyler, 21 N. Y. 567. When it was pleaded in this jurisdiction that these drafts were usurious under the law of Germany, it was necessary that the law of Germany should be pleaded as a fact, like every other fact establishing that defense. The defendants attempted to set up that law; but it is claimed, and was held by the learned justice below, that it was not sufficiently pleaded, and that there was a fatal variance between the pleading and the proof in that regard, and that the statute as established did not warrant any inference that the drafts were usurious. In that conclusion we agree. The allegation was that by the law of Germany it was provided that whoever, for a loan of money, should ask for or receive a promise which should exceed the customary rate of interest to such an extent that, according to the circumstances of the case, the interest on the capital was in remarkable disproportion to the services rendered, should be imprisoned, etc. It will be noticed that under that pleading all that it was necessary to prove to establish the fact of usury under the German law was that the payment for

money received should exceed the customary rate of interest to such an extent that, according to the circumstances of the case, the interest on the capital should be remarkably disproportionate to the services rendered. But, unfortunately for the defendants, these two facts are not sufficient to constitute usury under the German statute. By the law of the German empire, as proved, it was provided that "a person who takes advantage of the necessities, or recklessness, or the inexperience of another person accepts for a loan" or for the extension of a loan of money profits or benefits, and "these advantages are so much in excess of the customary rate of interest that, considering the circumstances of the case, the pecuniary benefits are strikingly disproportionate to the services rendered," shall be guilty of usury. It will be noticed that under the German statute, as proved, it was necessary to show, not only that the pecuniary advantages were strikingly disproportionate to the services rendered, but that the person receiving them took advantage of the necessities, recklessness, or inexperience of the person giving them; and, unless they were taken under those circumstances, the transaction was not usurious. There was no proof that the retention of the excess over the legal rate of interest in this case was obtained by taking advantage of the recklessness, inexperience, or the necessities of the person to whom the loan was made, and, in the absence of that proof, it is quite clear that the plaintiff could not be said to have been guilty of usury.

But it is said that the evidence of the experts offered by the defendants tends to show that the retention of this amount, under the circumstances shown here, was sufficient to constitute usury under the laws of Germany, and therefore that it was at least a question of fact for the jury. But the rule is that, where the law in question is a statute, which is put in evidence, and the court is called upon to construe it, the proper construction is a question of law, and not one of fact. Bank v. Morse, 44 App. Div. 435, 61 N. Y. Supp. 268, and the cases cited at page 440, 44 App. Div., and pages 271, 272, 61 N. Y. Supp. It was not error for the court, therefore, to determine this question, and we think he was correct in determining it as he did.

But the defendants insist that, as they were accommodation acceptors of these 13 drafts, they were released by the release of the securities which the plaintiff held to secure their payment. The answer of the plaintiff to this is, in the first place, that such a release was not sufficiently pleaded; and, secondly, that, if it were pleaded, the facts do not warrant a finding that there was any such release of securities as to discharge the defendants from their liability. As to these accommodation drafts, it is alleged in the answer that in the month of October, 1893, the plaintiff held as security for the payment of the indebtedness represented by them a large number of valuable securities, including a mortgage upon certain property belonging to Wilhelm Heidenheimer; and that the defendants, relying upon such security, accepted the drafts without consideration, and for the purpose of accommodating Wilhelm Heidenheimer. It is further alleged in the same connection that while the plaintiff

owned said drafts he entered into an agreement with Wilhelm Heidenheimer whereby he released Wilhelm Heidenheimer from all liability on the drafts, and upon other drafts included in the settlement, and that, "in consideration of such release and discharge, it was agreed that the plaintiff should retain at a certain valuation certain of the securities which he held as security for the payment of the aforesaid indebtedness represented by the said drafts, and should receive certain moneys for the release to the said Wilhelm Heidenheimer of certain other securities which were then in the plaintiff's possession and which he held as security for the payment of said drafts, and should further release, discharge, and cancel the mortgage which he also held as security for said claim and others, and that the said agreement was fully and duly performed by the said Wilhelm Heidenheimer and the plaintiff, and the plaintiff, pursuant to the aforesaid agreement, did release, discharge, and cancel the liability of said Wilhelm Heidenheimer on said draft and others. That by reason of the said agreement, and its performance by the parties thereto, these defendants have been greatly damaged, and their liability upon the acceptance of the aforesaid draft, if any existed, was released and discharged and canceled." This is clearly a sufficient allegation of the release of the securities; and the only question is whether there was any evidence tending to show that there was an agreement for the release of securities which was in fact carried out, and the value of them. The plaintiff held as security for these drafts, and for other advances to the drawers, two mortgages upon property in Nuremberg, certain acceptances called "Strauss acceptances," and 220 shares of the stock of the Schaffenberg Brewery. The amount of the drafts representing the loans to Wilhelm Heidenheimer on which the defendants were accommodation acceptors was about $86,000, or about 360,000 marks. It appeared that while the plaintiff was the owner of these drafts the firm of Wilhelm Heidenheimer became insolvent, and that an agreement was entered into between the plaintiff and Wilhelm Heidenheimer and the Heidenheimer Guarantee Association, which, it seems, was an association of the creditors of the insolvent firm, by which the plaintiff assumed the securities in his possession, except the Strauss acceptances, for which he was to be charged the sum of 100,000 marks, and agreed that the two mortgages for the sum of 200,000 marks should be canceled. It was testified by the plaintiff that the mortgages and the Strauss acceptances, so called, were of no value; and the defendants sought to show the value of these securities, claiming that they were entitled to be credited with the value of the securities retained. This was excluded on the ground that it was improper, incompetent, and not properly pleaded. This, we think, was error. The defendants, as to these 13 drafts, were accommodation acceptors, and therefore, in respect of them, occupied the position of sureties. As such, they were entitled either to be subrogated to so much of these securities as were held to protect these drafts, or to be credited upon the drafts for the fair value of whatever part of the securities was held as security for them. Bank v. Shields, 55 Hun, 274, 8 N. Y. Supp. 298; Guild v. Butler, 127 Mass. 386; Vose

v. Railroad Co., 50 N. Y. 369. Even if no evidence of their value had been offered, it having appeared that some of these securities were retained, and that certain others were discharged, the defendants would have been entitled to go to the jury upon that question. The Strauss acceptances had a face value of 100,000 marks; the brewery stock was of the par value of 220,000 marks, being 220 shares of the par value of 1,000 marks each; and the mortgages on the residences in Nuremberg were given to secure 200,000 marks. The only evidence in the case upon the value of these securities was that of the plaintiff, who testified that the mortgages and the Strauss acceptances were of no value whatever. Their face values are prima facie the value of the securities (Ingalls v. Lord, 1 Cow. 240; Griggs v. Day, 136 N. Y. 152, 32 N. E. 612, 18 L. R. A. 120), and, if the evidence of the plaintiff be considered as bearing upon that point, still, he being a party to the action, the weight of his testimony was properly to be considered by the jury, and they might have found, had the question been submitted to them, that the securities which were retained by the plaintiff were of the value of 520,000 marks,—a sum which is considerably more than the amount of the 13 drafts sued upon. We think that in disposing as he did of the question arising from the effect of the release of these securities, the learned justice erred, and that upon the evidence as it appeared it might have been said that the plaintiff, having in his possession securities of the face value of over 500,000 marks, retained those securities or released them; and that the defendants, being accommodation sureties, were damaged by that act, and that they were entitled at least to have a credit of the value of these securities allowed them. For this reason, the exceptions must be sustained, and the motion for a new trial granted, with costs to the defendants to abide the result of the action.

McLAUGHLIN and HATCH, JJ., concur.

INGRAHAM, J. I concur with Mr. Justice RUMSEY that the defense of usury was not sustained by the evidence; and also concur, though with some hesitation, in sustaining the exceptions to the direction of a verdict upon the ground that there was a question for the jury as to whether, by the acceptance of these drafts, the defendants became mere sureties for the drawers; and that, if the jury should so find, then the defendants would be entitled to credit for any securities that the plaintiffs' testator had delivered up to the drawers of the draft as the principal debtors. It is undoubtedly true that under the agreement between Wilhelm Heidenheimer, the drawers of these drafts, and the original plaintiff, the plaintiff was to give Wilhelm Heidenheimer a credit, which was to be made available by the plaintiff's purchasing drafts drawn by Wilhelm Heidenheimer upon the defendants in New York; and it was under this arrangement that the drafts in question were delivered to the plaintiff, who paid to the drawers the amount called for by the drafts, after deducting certain commissions and interest. The plaintiff then transmitted the drafts to New York to the defendants for acceptance. This trans-

action upon its face would be simply a sale of commercial paper, and upon the acceptance of the drafts the defendants would become the principal debtors, the drawers occupying the relation of indorsers, and liable only upon a failure of the acceptors to pay. I do not understand that the fact that the acceptor has no funds of the drawer of the draft in his hands makes any difference in the legal obligation of the acceptor to pay. It would not of itself make the drawer of the draft the principal debtor and the acceptor a surety. If the defendants accepted the drafts upon the credit of the drawers, or upon their promise to supply funds to pay the drafts at maturity, the liability of the acceptors would be the same as though they had in their hands money to pay the drafts at the time of the acceptance. To change the actual relations of the drawers and acceptors to the plaintiff, there must be evidence to show that, although the transaction was in form the transfer of these drafts, the substantial agreement between the parties, including the defendants, was a loan of money to the drawers of the drafts, to whom the plaintiff looked for repayment; and that it was understood, although the defendants in form became the original debtors by the acceptance of the drafts, that the real relation was that they were to be sureties, and that their obligation to the plaintiff was conditional upon the failure of the drawers of the drafts to make provision for their payment. I am inclined to think that there was testimony which required the submission of this question to the jury, and that, if the jury should find that the real agreement between these three parties was a loan of money to the drawers of the drafts, the drawers being the principal debtors, and that the plaintiff had knowledge that the acceptance was without consideration and to carry into effect this agreeement to give Wilhelm Heidenheimer a credit, then the question suggested by Mr. Justice RUMSEY as to the right of the defendants to have applied on account of those drafts the value of the securities held by the plaintiff would arise. I do not agree, however, that the mere fact that they accepted these drafts without funds in their hands to pay them at maturity, would change the relation of the plaintiffs to the drafts so as to prevent a recovery. If the plaintiff in Germany had purchased these drafts before acceptance, he would have had a right to secure himself against a failure of the drawees to accept them, and to hold any securities received for that purpose; and the defendants, the acceptors, would have no right to demand that such securities be applied to the payment of the drafts, for by the acceptance, whether made strictly for accommodation or not, the acceptors became the principal debtors, and they then, by their contract, became bound to pay the drafts at maturity, and liable to the holders of the drafts in case of nonpayment.

VAN BRUNT, P. J., concurs.